I am Jason Wagaspak, appearing today for both APTX, the owner of the Tanker American Liberty, and Crowley, the operator of the Liberty. The maritime incident that brings us here today occurred on May 16, 2019, while the American Liberty was attempting what is known as a top-around maneuver in the Mississippi River, which is essentially a U-turn in the river. We concede in our briefs that navigational errors made by the master, the federal pilot, and our crew caused the resulting elisions. But those errors under the Limitation Act and the prevailing law of the circuit should not deny APTX its entitlement to exoneration under the Act, or Crowley its entitlement to limitation. My argument today has three parts. The first is that APTX is entitled to exoneration. The second is that Crowley is entitled to limitation. And the third is that recovery against the vessel in rim is limited to her value under the law. I have a preliminary question about the limitation issue with Crowley. I don't have the complaint in front of me, but I looked at it before. I think the ship is valued at about $120 million. The security is $137,300,000. Okay, so even more than I thought. Are the claims going to come close to that? It didn't look to me like they are. You're getting at my question, which is why limitation is an issue. We have three remaining claimants, and combined, they allege their claims exceed the value of the vessel. Based on the grain damages? For ADM, it's their lost profit component as well as their physical damages. And for the personal injury claimants, it's their personal injury claims. And then Port of South Louisiana also has a property damage claim as well. I'd like to turn first to the exoneration of APTX. The determination of whether a shipowner is entitled to exoneration requires a court to make a finding of whether the shipowner's acts of negligence caused the incident. The burden of proving negligence is on the claimants and the limitation. Here, the claimants utterly failed to carry the evidentiary burden of proving APTX was negligent. And, in fact, if you look at the district court's decision, it lacks any finding of negligence specific to APTX. During the trial, the only evidence submitted with any relation to APTX was the testimony of Scott Clapman, who was the company's corporate representative. And he testified that APTX took possession of the American Liberty, which was, at the time, a brand-new American-built and American-flagged vessel, when she came out of the shipyard in 2017. APTX inspected the vessel at delivery and found her to be fit, sound, and compliant with all regulations and industry standards. And it should be noted that this vessel is a tanker in the Jones Act trade, which means it is subject to some of the most rigorous government regulations and industry standards in the world. After taking possession of the ship, APTX immediately passed her to Crowley to operate and manage pursuant to a ship management agreement. After that, APTX would audit the vessel to make sure she was compliant with federal regulations and industry guidelines, but overall the vessel was operated by Crowley. Crowley's responsibilities under the ship management agreement were comprehensive and far-ranging. In a nutshell... But that agreement says Crowley's the agent, so doesn't that mean APTX is responsible for the agent's negligence? Crowley was the agent in certain circumstances under the ship management agreement. In other words, Crowley, when they were contracted for maintenance, for example, and things of that nature, were acting as an agent on behalf or had the authority as the agent on behalf of the owners to do that. But Crowley wasn't acting as an agent in the elisions that occurred, and it's important to note that the district court made no finding of agency after the trial, and there was no argument of agency made at the trial level. Why weren't the presumptions enough as to APTX, even if you're right that they had no actual involvement on the vessel itself that day? So there were two presumptions that the trial court relied upon. The first was the organ presumption, and the organ presumption is triggered to find liability against the vessel. It can be triggered also to extend to liability the operator of the vessel, but APTX was not the operator of the vessel. And then... It was the owner. I mean, I thought... It was the owner, but... I thought the organ is about the owner of the vessel having that presumption. The organ is about the vessel in realm. So if you... The organ, it says that there is a presumption of negligence against the vessel in realm if a moving vessel strikes or aligns with a stationary object. So that's... The organ is about the vessel in realm. The other presumption that the district court relied upon was the Pennsylvania rule, but the Pennsylvania rule addresses only causation, not fault. So neither organ nor Pennsylvania can be used to have a presumption of fault against APTX. If you look at the district court's findings and conclusions of law, the district court found negligence on the part of the vessel in what was termed as the American liberty interest, which included both APTX and Crowley collectively. But again, the district court did not make any finding of negligence specifically as to APTX, and if you look at the district court's reasoning, the district court listed four failures that it concluded showed the crew's negligence during the incident was within the privity and knowledge of the collective vessel interest. But three of these alleged failures were specifically attributed to Crowley by the district court, and the fourth was specifically attributed to the master who was an employee of Crowley. The district court did not connect any of these failures to APTX. It is clear that the district court erred in improperly conflating APTX and Crowley as the vessel interest and not properly evaluating APTX conduct to see if a finding of negligence was supported. The evidence at trial established that APTX and Crowley are two separate, distinct, and unrelated companies. Their relationship is defined by the ship management agreement,  The vessel was under a time trial or demarathon who directed the vessel to her loading and discharge ports, and APTX's interaction with the vessel and her crew, who again were Crowley employees, was limited to the periodic audits. The district court did not use those audits to find negligence on the part of APTX. In sum, there is no act by APTX that was a contributory and proximate cause of this collision. The record is completely devoid of any evidence that supports the finding of negligence as to APTX. A reviewing court should set aside findings of facts by a trial court sitting without a jury where such findings are without adequate evidentiary support. Therefore, we respectfully request that the district court's decision denying APTX exoneration be reversed. If there are no further questions on APTX, I'll move to the issue of Crowley's right to limitation. When asked by the district court at trial what caused the incident, Crowley's corporate representative, Captain Culkin, was candid and forthright. He testified that errors in navigation made by the pilot, the master, and the crew that night all caused the accident. Specifically, the vessel was over-rotated in her turn when she came off the dock, the stern tug was released too soon, and the pilot, master, and crew were not situationally aware and failed to recognize or correct their errors before the vessel was put into an untenable navigational situation. Considering the district court's findings as to negligence, Crowley concedes liability on this appeal. But the question now is whether Crowley had privity or knowledge of these negligent acts to deny Crowley the right to limit its liability. We maintain that Crowley did not have the requisite privity or knowledge to deny limitation. As a reminder, privity or knowledge on the limitation act means complicity in the fault that caused the elision. There is privity if the owner or operator personally participated in the negligent conduct. That's the omega protein case. Knowledge is actual knowledge or knowledge that should have been obtained by reasonable investigation. It is important to remember that privity or knowledge standard does not require a vessel owner or operator to take every precaution. It obligates them instead to hire a competent crew and a competent master and to remedy deficiencies discovered through due diligence. So the district court cites the four crew failures that the district court concluded supported a finding of privity or knowledge as to Crowley. And these were, one, Crowley's failure to include information on the pilot card or master pilot exchange checklist about the engine response times. Two, Crowley's failure to train the crew on the vessel's Kongsberg automatic system. Three, Crowley's failure to ensure the master discussed the MSIB requirements. And four, the master's failure to alert the pilot of the delay in getting full revolutions from dead slow ahead to slow ahead. Let me stress here, because this is important, the district court made no finding that the vessel's engine malfunctioned or was otherwise defective on the night of the incident. In fact, there was only one expert engineer who testified at trial, and that was Jason Fernandez. And he testified that both the engine and the Kongsberg system performed exactly as they were designed on the night of the incident. He made this determination by looking at the computer printouts that the vessel was able to produce. There was no abnormal delay that was caused by the engine on the Kongsberg system, and the court did not. The district court's theory was that because they didn't know that they wouldn't be, the Kongsberg system prevented them from having full maneuverability, that if they had known that, then they wouldn't have released the tug so soon, and that that was the contributing cause. What the district court found, Judge Costa, was that when the pilot gave the command from dead slow ahead to slow ahead, that it took ultimately a minute and 32 seconds, I believe, to achieve those RPMs. The district court said that the reason for that delay was inconclusive. But the district court said that the pilot should have been warned about that there would have been such a delay before or outside of the voyage. But the district court did not connect that delay to the acceleration limitations that are connected with the engine. So in other words, the Kongsberg system that ran the engine helped it run in an efficient way. There was a button on the console that could be pushed that was called cancel limits, that had the ability to cancel the limitations of the speed up and add an additional 10 percent, I think, boost as to torque and scavenger air to the engine. That becomes important because the vessel needs those extra parameters to get through what's called the critical range, which is 45 RPMs to 55 RPMs. But the evidence is clear. The master testified there's nothing to dispute this. He pressed the cancel limits button before the vessel's engine reached that critical range. So the limitations on the engines were actually canceled before the vessel moved out of the dead slow ahead category or, I'm sorry, speed. Didn't Woodford say that he would have ordered the slow ahead sooner or waited to release the tug if he had known about the — that this delay would happen? He did say that at trial, Your Honor. But I would also ask you to look at the evidence of what Mr. Woodford actually did, what he testified that he did. And that is the pilot gave the order, give me to slow ahead when you can. The master, admittedly, then took 32 minutes — I'm sorry, 32 seconds — 32 seconds to walk from where he was to the bell to move the telegraph from dead slow ahead to slow ahead. After that, it took about a minute for the revolutions to be reached. But when the pilot said give me — or give me to slow when you can, what the master said is, okay, it's going to take a while with this current. What did the pilot do when he heard that? Nothing. The pilot didn't express surprise. He didn't express dismay. He had already released the stern tug at that point. He didn't get on the radio and call the stern tug back. The stern tug had been released about a minute before. So she was still in the vicinity. He didn't call her back. So although the pilot did testify at trial as to what he allegedly would have done had he been advised of the delay, the fact is, is that when he was advised of the delay, he did nothing. That's good impeachment material, but the district judge says, well, I'm still going to take him at his word. I find that credible. I mean, isn't that what fact-finders do all the time? You're exactly right, Your Honor. And the district court did, in fact, credit that testimony. The point that I would make is that the pilot not being told about the — well, first of all, what was the reason why the engine could not or the RPMs could not be achieved within the 15 seconds or so that the pilot testified that that's what he would expect? Again, the district court didn't say that there was any abnormality or peculiarity about the engine itself that caused that delay. The district court said the delay was inconclusive, right, that there was no evidence conclusive on point. We would point to the expert testimony of Captain Gupta, who was the navigational expert, called at trial, and to Mr. Fernandez again, the engineer. Their testimony is it was environmental factors that caused the engine to be sluggish. That's because the river was at flood height, right, 23 feet, I believe. The knob was running around 5 to 7 miles an hour. So that creates a drag on the propulsion system of the vessel. The pilot, as the local expert of water conditions, should have been aware of the fact that a high river condition and a rapid current would create drag on the propulsion system. He was evidently not aware of that, even though, and I might also add, he had been on this vessel, I think, seven or eight times before, and had operated vessels with this exact same engine in Kongsberg's system. Thank you. Good morning, Your Honors. May it please the Court, Rob Hockman for AVM. Judge Costa, I think you have it exactly right. I'm going to start with the basic negligence, the basic problem that caused the elision, explain why Crowley is legally responsible and not entitled to limitation, and then it will flow, I think, rather naturally to APTX as well. The finding that you're referring to is actually on page 23 of the district court's opinion. It's paragraph 18, and it says, Had the pilot been alerted to the delay in getting full revolutions from dead slow ahead to slow ahead and the delayed responsiveness of the system, he would have ordered the slow-ahead order earlier or refrained from releasing the stern tug when he did. And we heard a lot about Pilot-Woodford's supposed errors after the fact, but let's be clear about something procedurally. There's a procedural issue here as well. The district court's judgment exonerates Pilot-Woodford completely. The district court's ruling judgment says Pilot-Woodford, everything that went wrong, went wrong because of that, because Pilot-Woodford wasn't informed about the way in which the software system limits the ability of this engine to accelerate during that critical space between dead slow ahead and slow ahead beyond much, much, much slower than he reasonably expected. And since he's exonerated, they can't come up here and say that's the cause of the accident. I mean, they've sort of given that away. They are the only responsible party for this accident, and they're not appealing anybody else's exoneration in this case. But turning to the facts, the critical things, and it's really quite simple, I think. One, the pilot reasonably believed under the conditions that prevailed at the time, and that's what the evidence showed and what the district court found, the environmental factors were taken into consideration on that 15-second estimate from getting from dead slow ahead to slow ahead. Captain Bonvino knew that wasn't the case, but he didn't share that information with Pilot-Woodford before the maneuver began or before they left port. And so the pilot released the stern tug when he reasonably expected. By the way, they said there was a statement that Pilot-Woodford over-rotated the vessel. There's no finding to that effect in the district court's opinion. And in fact, Captain Bonvino testified, this is at 8304-05 of the testimony in the record, that the maneuver was going as planned until the order from dead slow ahead to slow ahead was given. In other words, the rotation was fine if it would only take 15 seconds to get the speed that was needed. So that's the problem. So now why is Crowley responsible for that? Crowley writes the pilot card. Crowley took no action. Crowley did nothing to educate its crew on the mechanism of the Kongsburg system and how it works and why it works and to alert its crew of the importance of informing the pilot that you're going to have this slower-than-expected acceleration. And that's Crowley's liability, and that's the district court's, and that's the rationale of the district court. So, you know, unless you have further questions about — That's what triggers the Pennsylvania. That's what triggers the Pennsylvania, yeah, because there are the regulations, and we cite them all in our brief, but there's the MSIB. It couldn't be more clear. This is a concern that you absolutely have to communicate to the pilot because it's a known problem. It's an issue. And remember, this Kongsburg system, we heard also about the Kongsburg system, that there were other causes, but there was plenty in the record that the software system has a variety of different limiters. This is at 9-11, 91-12 to 13. The chief engineer can adjust the settings. 91-45 to 46, there's something called an acceleration limiter. Critical RPM avoidance, 97-15. They go through all of the different kinds of limiters, but the key thing that matters is this. It was reasonable to expect 15 seconds, and it couldn't get 15 seconds. And they come in. I think it's actually a little bit ironic. They come in and they say, well, the district court didn't find exactly why it took longer. But that's precisely the problem. The witnesses, the people on board that vessel, don't know how the software system works. They know that it goes slow. They don't know why. They didn't take the steps necessary to make sure that they couldn't as the regulations required, and that's the problem. That's the liability. Nobody at Crowley understood it. Nobody at APTX understood it. And that's liability. So unless there are further questions about Crowley, I'll turn to APTX very quickly. So what else is in the record about APTX? Well, there's a charter agreement that it had with Marathon in which it says, and this is at 99-56 of the record, APTX will keep current on all applicable rules and procedures. They audited the vessel. So in other words, this is not a case where the court held APTX liable for the negligence of Crowley's crew. That's the Kirstie Lee case. That's a different issue. This is a situation where you have a vessel owner that takes responsibility, expressly takes on contractual responsibility, for maintaining rules and procedures applicable to safety, audits the procedures of Crowley in the process, and nonetheless says, those are all empty gestures because Crowley is a reputable operator and our liability ends as soon as we hand the vessel off to a reputable operator. It's my submission, Your Honor, that that would be a novel extension of the law with no particular benefit, either for owners or vessel safety. And for that reason, the district court correctly determined that APTX 2 was liable. On the Oregon rule, do you agree with him that it only applies to NNREM proceeding? So what the Oregon rule does is it establishes a presumption of negligence, right, for collisions, right, for situations where a moving vessel hits a stationary object. That's true and that's not disputed. And at the end of the day, I mean, I think especially the Pennsylvania rule I think is relevant here, but at the end of the day, we proved up both negligence and the causal links, so it doesn't really matter for your honors. If there are no further questions, I'll be happy to yield the remainder of my time. Thank you. Just to briefly address a couple of points. First of all, with regard to APTX, counsel for the appellees mentioned the fact that there was a contract in place between Marathon and APTX. Yes, indeed there was. There was a charter party in place. That charter party is the parties to that charter party are Marathon and APTX. The appellees here, none of the appellees here are members or are part of that charter party. They're owed no duties under that charter party. Another issue I'd like to bring up is that in the brief, the appellees relied very heavily on unseaworthiness claims or unseaworthy cases to argue liability of APTX because the argument is, well, we don't have a seaworthy vessel, and so therefore, as owner, they're going to be liable. The problem with that argument is that the district court already found that none of the claimants had an unseaworthy cause of action against the vessel or against APTX. He dismissed on a motion for partial summary judgment all the unseaworthiness claims and said if you want to establish liability of either APTX or Crowley, you have to do that through negligence. And they did not do that on the negligence side. And then finally, the idea that it's a novel extension of the law for vessel owners to cede control of their vessel to competent operators and therefore won't face liability, it's not a novel concept in maritime law. I mean, that's the whole concept of a bareboat charter, right? I mean, an owner can bareboat charter his vessel to an operator, and at that point, the owner's obligation to the vessel and the owner's liability from the vessel ceases. And that's essentially what happened here. We don't have a bareboat charter. I want to be clear about that. But the Vessel Operating Management Agreement essentially functioned the same way in that the owner turned the vessel over to a rectal operator, and from that point on, the operator had full control over the ship. On the issue of— What's the best authority for that position then outside of a bareboat charter context? Hmm. You mean— It's an extension to say that this, you know, signing all these duties to Crowley basically takes APTX out of the picture. What kind of case or authority is the best support for your argument there? I don't have a case off the top of my head, Your Honor. I can think of the Influsa case, which was a case that involved a bareboat charter situation where the— and I can get you the site, Your Honor, later, but it was a case where there was a collapse of the stow. And as I recall, there was an argument that was made against the actual owner of the vessel who had bareboated to a bareboat charter. And the court—and I want to say this was a Second Circuit case— the court held in a bareboat charter situation, the owner's liability ceased at the point of delivery of the vessel. And then the final point I'd like to just point out is the whole issue of the Comsburg system to me is a red herring. Again, there was no finding. There was only one engineer who testified at trial, and by the way, only one engineer who actually went on the ship and looked at the ship. None of the other experts in this case ever even boarded the American Liberty. And that engineer testified that there was nothing wrong with the Comsburg system. There was nothing wrong with the engine. They designed—I'm sorry, they performed exactly as designed. The district court did not make such a finding either. So I believe the whole issue in the Comsburg system and whether or not the crew was trained on it or not, none of that matters, because none of it is causally connected to what happened on the night of this incident. If there are no further questions, I would respectfully ask that the district court reverse—I'm sorry, that this court reverse the district court's finding of no liability—I'm sorry, no limitation on behalf of Crowley and no exoneration on behalf of APTX. Thank you.